UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
                              )
ASSOCIATION OF INDEPENDENT BR )
FRANCHISE OWNERS,             )
                              )
            Plaintiff,        )
                              )
       v.                     )     CIVIL ACTION
                              )     NO. 16-10963-WGY
BASKIN ROBBINS FRANCHISING, LLC, )
                              )
            Defendant.        )
_____)

YOUNG, D.J.                                    September 27, 2017

**FINDINGS OF FACT, RULINGS OF LAW, & ORDER**

**I.   INTRODUCTION**

In this action for declaratory relief, the Association of Independent BR Franchise Owners (the "Association") seeks a judgment that franchisor Baskin Robbins Franchising, LLC ("Baskin") has no contractual right to charge its franchisees a "Commercial Factor Fee." The parties have now filed cross-motions for summary judgment, Pl. Association Independent BR Franchise Owners Mem. Law. Supp. Mot. Summ. J. ("Pl.'s Mem."), ECF No. 56; Pl.'s Mem. Points and Authorities Resp. Mot. Summ. J. ("Pl.'s Opp'n"), ECF No. 65; Pl. Association Independent BR Franchise Owners Reply Supp. Mot. Summ. J. ("Pl.'s Reply"), ECF No. 73; Mem. Def. Baskin-Robbins Franchising LLC Supp. Mot.

Summ. J. ("Def.'s Mem."), ECF No. 53; Mem. Def. Baskin-Robbins Franchising LLC Opp'n Mot. Pl. Association Independent BR Franchise Owners Summ. J. ("Def.'s Opp'n"), ECF No. 64; Reply Mem. Def. Baskin-Robbins Franchising LLC Supp. Mot. Summ. J. ("Def.'s Reply"), ECF No. 72, and accompanying statements of fact, Pl. Association Independent BR Franchise Owners Statement Undisputed Material Facts ("Pl.'s Facts"), ECF No. 57; Def. Baskin-Robbins Franchising LLC's Statement Material Facts ("Def.'s Facts"), ECF No. 54. By agreement of the parties, this Court held a case stated hearing[1] on June 9, 2017, Electronic Clerk's Notes, ECF No. 74, and here issues findings of fact and rulings of law.

## II. FINDINGS OF FACT

Baskin is a Delaware limited liability company with its principal place of business in Canton, Massachusetts. Def.'s Facts ¶ 1. For over fifty years, Baskin has licensed independent business owners to operate ice cream shops that use the Baskin Robbins trademark and sell Baskin's proprietary ice cream and related products. Id. ¶ 4. Members of the

---

[1] The case stated procedure allows the Court to render a judgment based on a largely undisputed record in cases where there are minimal factual disputes. In its review of the record, "[t]he [C]ourt is . . . entitled to 'engage in a certain amount of factfinding, including the drawing of inferences.'" TLT Constr. Corp. v. RI, Inc., 484 F.3d 130, 135 n.6 (1st Cir. 2007) (quoting United Paperworkers Int'l Union Local 14 v. International Paper Co., 64 F.3d 28, 31 (1st Cir. 1995)).

[2]

Association are standalone franchisees that collectively own eighty-four Baskin Robbins stores. Compl. ¶¶ 15-16.

Prior to 1998, Baskin franchisees either paid no royalty fees or paid a small percentage of "Continuing Franchise Fees" (0.5%), and purchased the vast majority of their ice cream products from Baskin or an affiliate. Pl.'s Facts ¶¶ 1-2. As a result, Baskin derived its primary revenue from the sale of ice cream products. Id. In 1998, Baskin offered its franchisees a "Royalty Conversion Program" that: 1) raised or imposed for the first time a Continuing Franchise Fee of 4.9%; 2) raised the advertising fee paid by the franchisee to 5.0%; 3) lowered the costs for ice cream products and other goods; and 4) charged a "Commercial Factor" on ice cream and other products. Id. ¶ 3. The vast majority of then existing franchisees accepted the terms of the program, and executed conversion agreements that included terms requiring franchisees to pay to Baskin a "Commercial Factor" on its ice cream and related products. Id. ¶ 6. Today, the number of franchisees remaining subject to these conversion agreements is close to zero. Id.

Beginning in 2000, new and renewing franchisees have entered into a franchise agreement (which the Association refers to as the "Current Franchise Agreement"[2]) that does not contain

---

[2] In general, there are two versions of the Current Franchise Agreement -- one for 2000-2007, and another for 2008-

[3]

the terms "Commercial Factor" or "Commercial Factor Fee." Id. ¶ 9. Also in 2000, Baskin ceased production of ice cream, outsourcing the manufacture and wholesale distribution of its proprietary products to Dean Foods, a dairy vendor designated by Baskin. Def.'s Facts ¶ 6. Pursuant to the Current Franchise Agreement ("Agreement"), franchisees must purchase all of their ice cream and related products from Dean Foods. Id. ¶ 9. Dean Foods pays a fee to Baskin based on the volume of Dean Foods's sales of certain products to Baskin franchisees. Id. ¶ 7. This basic arrangement has been in effect for approximately sixteen years. Id. ¶ 11.

Dean Foods charges Baskin franchisees a "Commercial Factor" on products. Id. ¶ 9. In 2016, franchisees paid a commercial factor of $1.26 per tub of ice cream, and $6.52 per case of Pastry Pride Non-Dairy Whip Topping. Pl.'s Facts ¶¶ 12-13.

Each Agreement contains an integration and merger clause, which provides that the Agreement can only be modified by a writing signed by the parties. Pl.'s Facts ¶ 18. For example, the 2000 Agreement contains a clause that states:

> This Agreement, and the documents referred to herein shall be the entire, full and complete agreement between FRANCHISOR and FRANCHISEE concerning the subject matter hereof, and supersedes all prior agreements, no other representation having induced FRANCHISEE to execute this

---

2016. Although there are some variations from year to year within these two broad categories, these are irrelevant to the Court's present analysis.

> Agreement; and there are no representations, inducements,
> promises or agreements, oral or otherwise, between the
> parties not embodied herein, which are of any force or
> effect with reference to this Agreement or otherwise. No
> amendment, change or variance from this Agreement shall be
> binding on either party unless executed in writing.

Id., Ex. 3, Baskin-Robbins 2000 Franchise Agreement, BASKIN0000910, ECF No. 57-3.

**III. RULINGS OF LAW**

The issue before the Court is the interpretation of the Current Franchise Agreement. The Association views the dispute fundamentally as concerning the scope of contractually permissible fees, contending that because the fully integrated franchise agreements do not include a "Commercial Factor Fee" as part of the Agreement's fee provisions, franchisees have no contractual obligation to pay such fees. Pl.'s Opp'n 12-13. On the other hand, Baskin frames the dispute as one concerning product pricing, arguing that the Commercial Factor is simply a franchise fee charged to Dean Foods, that Dean Foods then passes on to the purchasers of their products, the franchisees. Def.'s Mem. 1-2. The Court begins with the proper characterization of the Commercial Factor, then examines the relevant provisions of the Agreement and the parties' course of dealing.

    A.    **Massachusetts Contract Law**

In Massachusetts, a contract's interpretation is a question of law for the court, so long as there is "no dispute as to the

facts to be applied to the terms of the contract." Norfolk & Dedham Mut. Fire Ins. Co. v. Morrison, 456 Mass. 463, 467 (2010) (quoting Ober v. National Cas. Co., 318 Mass. 27, 30 (1945)). Similarly, "[w]hether a contract is ambiguous is also a question of law." Eigerman v. Putnam Invs., Inc., 450 Mass. 281, 287 (2007) (citing Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989)). Indeed, "[a]ny conflict as to the meaning of contract terms . . . is a matter of law for the court." Id. at 288 n.8 (citing Allstate Ins. Co. v. Bearce, 412 Mass. 442, 446-47 (1992); Cody v. Connecticut Gen. Life Ins. Co., 387 Mass. 142, 147 n.9 (1982)).

In general, "'[t]he interpretation of an integrated agreement is directed to the meaning of the terms of the writing or writings in the light of the circumstances' of the transaction." Boston Edison Co. v. Federal Energy Regulatory Comm'n, 856 F.2d 361, 365 (1st Cir. 1988) (alteration in original) (quoting Thomas v. Christensen, 12 Mass. App. Ct. 169, 476 (1981)). In determining whether contract language is ambiguous, courts examine whether the language "is susceptible of more than one meaning and reasonably intelligent persons would differ as to which meaning is the proper one." Citation Ins. Co. v. Gomez, 426 Mass. 379, 381 (1998) (citation omitted). "[E]xtrinsic evidence may be used as an interpretive guide only after the judge or the court determines that the contract is

ambiguous on its face or as applied . . . . [and] is not to be used as the basis for concluding in the first instance that a contract is unambiguous as matter of law." Bank v. Thermo Elemental Inc., 451 Mass. 638, 649 (2008) (citations omitted).

**B.   The Commercial Factor**

Baskin contends that the Commercial Factor that Dean Foods receives from the franchisees is not a "fee" charged to the franchisees at all, but rather a component of the product price of the ice cream and related products. Def.'s Mem. 8-9. Under this interpretation, franchisees cannot avoid their obligation to pay the purchase price of ice cream products from Dean Foods. Id. In response, the Association argues that: 1) Baskin itself describes the fee it charges Dean Foods as a "Commercial Factor Fee" in section 4.2 of the Supply Agreement, Def.'s Facts, Ex. 1.B, 2015 Supply Agreement, ECF No. 54-3; and 2) functionally, the Commercial Factor is a fee charged by Baskin to franchisees because Dean Foods is merely a conduit that collects the fee for Baskin. Pl.'s Opp'n 10-11.

In support of its contention that "Commercial Factor" and "Commercial Factor Fee" are two entirely distinct terms describing two completely separate components of the economic relationship among Baskin, Dean Foods, and franchisees, Def.'s Mem. 8-10; Def.'s Reply 8, Baskin begins by citing the well-established proposition that "Black's Law Dictionary is a

standard resource for the determination of the meaning of words used in a legal context." Def.'s Reply 8 (citations omitted). Indeed, Massachusetts courts have stated that "[i]n the absence of case law, established dictionaries can furnish the approved natural meaning of disputed terms." Suffolk Constr. Co. v. Illinois Union Ins. Co., 80 Mass. App. Ct. 90, 94 (2011) (citations omitted); see also Siebe, Inc. v. Louis M. Gerson Co., 74 Mass. App. Ct. 544, 551 (2009). Black's Law Dictionary defines "fee" as "[a] charge or payment for labor or services." Black's Law Dictionary 732 (10th ed. 2014). Notably, the dictionary also defines, in the same entry, "franchise fee" as "[a] fee paid by a franchisee to a franchisor for franchise rights." Id. Whereas, "price" is defined as "[t]he amount of money or other consideration asked for or given in exchange for something else; the cost at which something is bought or sold." Id. at 1380.

In contrast, the Association essentially invites the Court to ignore the fact that the Commercial Factor that the franchisees <u>actually pay</u> is a component of the product price charged by Dean Foods, and instead treat it as a fee that is paid directly to Baskin. The Association cites two facts -- (1) sections 1.2 and 4.2 of the 2015 Supply Agreement explicitly refer to the fee charged to Dean Foods as a "Commercial Factor Fee," Pl.'s Opp'n 9, and (2) the same sections state that Dean

[8]

Foods will receive a credit against the Commercial Factor Fee for any Commercial Factor fee paid in connection with any products that have not been paid for in full by franchisees, 2015 Supply Agreement §§ 1.2, 4.2 -- but provides no legal authority to support this theory.[3]

---

[3] The Court pauses briefly to consider two arguments that the Association does not make. The Association does not raise the concept of "functional equivalence" in interpreting contracts. To the extent that Massachusetts courts have recognized such a doctrine, the cases do not appear to apply to these facts. See, e.g., In re Adoption of Vidal, 56 Mass. App. Ct. 916, 916 (2002) ("An assessment completed by one employed by an organization under contract with DSS is the functional equivalent of an assessment undertaken by a person employed directly by DSS."). But see Brasi Dev. Corp. v. Attorney Gen., 456 Mass. 684, 694 (2010) (upholding lower court finding that lease agreement between "was not 'the functional equivalent of a construction contract' because Brasi retained ownership of the land and the building, assumed the risks and costs of construction, and assumed also the costs of ownership of the finished dormitory").

Nor does the Association challenge the Agreements as a sham or base its argument in the implied covenant of good faith and fair dealing. Nevertheless, there is insufficient evidence in the record to sustain an allegation that the contracts at issue here were a sham or that Baskin had defrauded its franchisees. See Lass v. Bank of Am., N.A., 695 F.3d 129, 144-45 (1st Cir. 2012) (dismissing sham allegations as "pure rhetoric . . . especially because of the ease of pleading real facts (if they existed)" (citation omitted)); see also Hemi Grp., LLC v. City of New York, 559 U.S. 1, 26 (2010) ("This Court has recognized specifically that 'under the common law a fraud may be established when the defendant has made use of a third party to reach the target of the fraud.'" (quoting Tanner v. United States, 483 U.S. 107, 129 (1987))). Furthermore, counsel for the Association argued that the implied covenant of good faith and fair dealing was not implicated because express provisions of the Agreement govern the fees. June 9, 2017 Hearing Tr. 17:24-18:10, ECF No. 75.

On balance, the more compelling interpretation of the Commercial Factor is that it is a franchise fee Baskin charges Dean Foods for the right to sell Dean Foods products under the Baskin Robbins name to Baskin's franchisees; and that Dean Foods then charges this back to franchisees. This component of Dean Foods's product price, therefore, is simply a pass-through cost and Dean Foods does not make any money on the "commercial factor" that it adds to the wholesale cost of the products it sells to the franchisees. The question is whether this arrangement is permissible under the Franchise Agreements.

### 1. Contract Language

The Court thus turns to the contract language of the Agreements to determine whether the provisions obligate the franchisees to pay the commercial factor Dean Foods charges.

The Association first focuses on the fee provisions in the Agreements. Sections 4 and 10 in the 2000 through 2007 Agreements and sections 5 and 13 in the 2008 through 2016 Agreements list fees that franchisees are obligated to pay to Baskin. Pl.'s Facts ¶ 8. Though the exact provisions differ somewhat from year to year, the 2000 Agreement includes: Initial Franchise Fee, Grand Opening Fee, Continuing Franchise Fee, Continuing Advertising Fee, Late Fees, and Transfer Fee. <u>Id.</u> ¶ 8(a). Similarly, the 2015 Agreement sets out: Initial Franchise Fee, Initial Training Fee, Marketing Start-Up Fee,

Continuing Franchise Fee, Continuing Training Fee, Continuing Advertising Fee, Additional Advertising Fee, Late Fees, Transfer Fee, and Fixed Documentation Fee. Id. ¶ 8(p). It is undisputed that the Current Franchise Agreement does not explicitly mention a "Commercial Factor Fee." Id. ¶ 10. In light of these fee provisions, the crux of the Association's case is that because the Current Franchise Agreement is fully integrated but does not list the Commercial Factor Fee, the franchisees do not have a contractual duty to pay it. Pl.'s Mem. 7.

In response, Baskin first argues that the "fee" provisions cited by the Association do not expressly state that they encompass the only instances in which Baskin may derive revenue from its franchisees. Def.'s Mem. 6. Baskin argues that under Massachusetts law, contracts are not interpreted to prohibit activity not expressly permitted if the contract does not state explicitly that "activities not expressly permitted are forbidden." Id. at 7 (citing Robert Indus., Inc. v. Spence, 362 Mass. 751, 755–56 (1973) ("[T]he lease nowhere says that activities not expressly permitted are forbidden . . . . [but instead] simply does not deal with competition other than competition by lessees.")); see also Abegglen v. Abegglen, 64 Mass. App. Ct. 590, 596 (2005) ("The separation agreement does not expressly prohibit anything else he has done. . . ."); Proteon, Inc. v. Digital Equip. Corp., No. 9801533F, 1999 WL

1336438, at *12 (Mass. Super. Ct. Jan. 13, 1999) (Smith, J.) ("[B]ecause the Agreement does not expressly forbid assignment by Digital and because there is no evidence that assignment would give rise to any of the exceptions noted above, as a matter of law, Digital may assign its rights under the Basic Order Agreement."). But see Abbott v. John Hancock Mut. Life Ins. Co., 18 Mass. App. Ct. 508, 524 (1984) ("The fact that the trust agreement did not contain a provision expressly prohibiting policy loans does not necessarily mean that they were permitted."). On balance, the case law favors Baskin's argument that the lack of an express prohibition in the fees provisions precludes the Association's reliance on the fee language in the Agreements.

Second, Baskin contends that under Massachusetts law, contracts must be interpreted as a whole rather than as isolated provisions. Def.'s Opp'n 5 (citing MCI WorldCom Commc'ns, Inc. v. Department of Telecomms. & Energy, 442 Mass. 103, 112-13 (2004) ("To ascertain the intent of contracting parties, the court considers the words used by the parties, the agreement taken as a whole and the surrounding facts and circumstances." (citations omitted))); see also Lydon v. Allstate Ins. Co., 5 Mass. App. Ct. 771, 771 (1977) ("The intent of the parties entering into the contract must be gathered from construing the contract as a whole and not by placing special emphasis on any

[12]

one part." (citation omitted)).  Specifically, Baskin highlights the provisions dealing with product pricing -- section 5.1.5.1 of the 2000-2007 Franchise Agreements and sections 7.04 and 7.05 of the 2008-2017 Franchise Agreements, Def.'s Mem. 10-11. Section 5.1.5.1 of the 2000 Agreement states that the franchisee "agrees to purchase from Baskin-Robbins or its designee . . . all of the Baskin-Robbins requirements for the Baskin-Robbins Products specified by [Baskin] from time to time . . . at [Baskin's] or its designee's prices at the time of delivery." Def.'s Facts ¶ 19(f).  Similarly, section 7.0.5 of the 2016 Agreement requires that franchisees "[s]ell all required products, sell only approved products, and source them from suppliers that [Baskin] approve[s], of which [Baskin] may be one."  Id. ¶ 19(b).

In response, the Association advances three arguments: (1) the pricing provision only requires franchisees to purchase products at the price set by the vendor and is therefore irrelevant to this dispute, Pl.'s Reply 6; (2) section 5.1.5.1 does not state a duty to pay a fee to Baskin, id.; and (3) such an interpretation is untenable, because it would allow Baskin or Dean Foods to impose any additional fee on top of the wholesale price of the ice cream and related products, Pl.'s Opp'n 13-14. Baskin correctly points out that the Association does not in fact challenge that franchisees are required under the product

[13]

purchasing provisions of the Franchise Agreements to purchase products from Dean Foods. Def.'s Reply 1.

The key flaw in the Association's case is that it does not cite any legal support for the argument that Dean Foods cannot embed one of its costs into the ice cream price that it charges its customers. Indeed, pass-through costs and charges along the supply chain is a standard industry practice.[4] In support of its argument, the Association relies primarily on cases involving Baskin Robbins as a party in other courts. The Association cites Brock v. Baskin Robbins, USA, Co., No. 5:99-CV-274, 2003 WL 21309428, at *5 (E.D. Tex. Jan. 17, 2003), and Baskin-Robbins Inc. v. S & N Prinja, Inc., 78 F. Supp. 2d 226, 232-33 (S.D.N.Y. 1999), for the basic rule that collateral promises are not enforced where there is a fully integrated contract. Pl.'s Mem. 7-8. Brock does no more than state the general proposition that "where a merger clause is included in the written contract,

---

[4] To rule for the Association in this case would imply that Dean Foods has done something wrong by simply passing on one of its costs to its buyers -- a common industry practice. See Howard Smith & John Thanassoulis, Prices, Profits, and Pass-Through of Costs Along a Supermarket Supply Chain: Bargaining and Competition, 31 Oxford Rev. Econ. Pol. 64, 66 (2015). There is no evidence in the record of any contractual provision forbidding Dean Foods from setting its price this way. Indeed, franchisees can and very well may pass franchise fees on to customers, subject to any contractual pricing constraints, although there is no evidence of this in the record. Furthermore, the Association does not challenge Baskin's ability to charge its exclusive distributor a franchise fee.

[14]

alleged collateral promises will not be enforced." 2003 WL 21309428, at *5. In S & N Prinja, the defendants filed counterclaims against Baskin Robbins alleging that Baskin denied them permission to relocate their store. 78 F. Supp. 2d at 232. The court dismissed the counterclaim, holding that under New York contract law, a fully integrated agreement that made no reference to a corporate policy allowing relocation imparts on Baskin no contractual duty to assent to defendant's relocation. Id. at 233. Here, however, there is a specific contractual provision as to price, which states that franchisees are obligated to pay the price of ice cream charged by Dean Foods. Def.'s Opp'n 4-5. Accordingly, a plain reading of the contract supports the interpretation that Baskin was entitled to derive revenue from franchisees by charging a franchise fee to Dean Foods, which Dean Foods then passes on to its purchasers.

2. **Course of Dealing**

The parties further dispute whether this Court may examine the course of performance in determining the scope of the Franchise Agreements. Baskin argues that courts may examine "all the circumstances of the parties leading to [the contract's] execution." Def.'s Opp'n 4 (quoting Boston Edison Co., 856 F.2d at 365). The Association, however, correctly notes that a court only examines the course of dealings in order to determine the parties' intent where there is ambiguity in the

contract language.  Pl.'s Opp'n 17-18 (citing S & N Prinja, Inc., 78 F. Supp. 2d at 233).  Although Baskin prevails even if this Court's analysis were confined to the four corners of the Agreement, the Court comments briefly on the extrinsic evidence.

To the extent that there is any ambiguity as to what "price" means, or what prices Baskin and its designated distributor are entitled to charge under the Franchise Agreement, the Court looks to the parties' course of performance.  Here, Baskin argues that the course of conduct between the parties unequivocally shows that the Commercial Factor -- a part of the product price Dean Foods charges -- was paid without objection despite franchisees' clear knowledge that Baskin was entitled to receive revenue from the sale of its proprietary ice cream and related products.  Def.'s Mem. 17.  As required by the Federal Trade Commission's ("FTC") franchise regulations, Baskin disclosed to franchisees that it reserved the right to receive "fees or other consideration" from suppliers in connection with its granting or licensing of supply rights.  Id. at 15.[5]  Baskin further disclosed that it received

---

[5] Baskin also argues that the FTC franchise regulations reflect the custom and business usage in franchise agreements of treating disclosure of fees that a franchisee pays to its franchisor and fees that a franchisor receives from an approved supplier in separate regulations.  Def.'s Mem. 11-12.  This structure, Baskin contends, reflects that the industry custom of treating the two types of fees as distinct.  Id.; see 16 C.F.R. § 436.5(e), (f), (h)(6).

revenue from franchisees' required purchases from Dean Foods. Def.'s Facts ¶ 25.

Finally, every franchisee received a copy of the August 2012 announcement of the Brand Contribution Plan (which reinvested part of the revenue generated from the Commercial Factor into advertising and promoting the Baskin Robbins brand) that attributed part of its funding to revenue generated from the Commercial Factors. Id. ¶ 30. Indeed, the Chairperson of the Association, Shaw Darwish ("Darwish"), attended meetings as a member of Baskin's Brand Advisory Council concerning the company's 2012 launch of the Brand Contribution Plan. Def.'s Opp'n 9. Darwish also apparently paid the Commercial Factor for fifteen years. Id. at 8. The Association, in response, argues only that the course of dealings is not relevant where there is no ambiguity in the contract language. Pl.'s Opp'n 19. Faced with an unambiguous contract, the plain language of which allows Baskin to charge Dean Foods a franchise fee, which Dean Foods is free to pass onto its customers, this Court need not consider the extrinsic evidence. The Court merely notes that should there be an ambiguity in the Agreement, the parties' course of performance overwhelmingly favors Baskin's interpretation.

**IV. CONCLUSION**

Accordingly, this Court declares that Baskin's "Commercial Factor" is not an unauthorized additional fee imposed upon its franchisees and thus judgment will enter for Baskin.

**SO ORDERED.**

<u>/s/ William G. Young</u>
WILLIAM G. YOUNG
DISTRICT JUDGE